## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-1133

DAVID SCOTT BRADFORD,

      Plaintiff,

v.

COMMUNITY INVESTORS, INC. d/b/a FRONTSTEPS, a Delaware corporation,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, David Scott Bradford, by and through his attorneys, Sweeney & Bechtold, LLC, hereby submits his Complaint against the above-named Defendant as follows:

### INTRODUCTION

1.    This is an employment discrimination suit brought by a former employee of Community Investors, Inc. d/b/a FRONTSTEPS ("Frontsteps"), who was discriminated and retaliated against up to and including being terminated in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.*  Plaintiff further asserts claims against Defendant of invasion of privacy – intrusion upon seclusion, invasion of privacy – public disclosure of private facts, and outrageous conduct/intentional infliction of emotional distress.

### PARTIES

2.    Plaintiff David Scott Bradford is a resident of the State of Colorado.

3.    Defendant Frontsteps is a Delaware corporation authorized to do business in Colorado.

4.      Frontsteps' principal office is located at 1290 N. Broadway, Suite 1400, Denver, Colorado 80203.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343, in that this action arises under federal law, specifically the ADA.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as the unlawful employment practices alleged herein were committed within this judicial district.

7.      At all relevant times, Defendant Frontsteps was covered by the definitions of "employer" set forth in 42 U.S.C. § 12111(5)(A).

8.      The procedural prerequisites for the filing of this suit have been met.  Plaintiff has filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and has received a Notice of Right to Sue letter.

## SPECIFIC ALLEGATIONS

9.      Frontsteps is in the business of delivering property management software to property management companies, condo developers, and home builders.

10.      Frontsteps hired Plaintiff in or around March 2018 as a consultant and later promoted him to a full-time position as Director of Sales on June 29, 2018.

11.      Plaintiff was hired by and later reported to Chief Marketing & Revenue Officer Eric Waldinger.

12.      Plaintiff brought in considerable revenue for Frontsteps throughout his tenure as Director of Sales and was well-liked by his direct reports, other employees, and Frontsteps' customers.

13.     For example, Plaintiff was charged with upgrading Frontsteps' customers from Frontsteps' legacy product, AtHomeNet, to the new product, Frontsteps.

14.     The company established a goal to upgrade 25% of all existing customers of AtHomeNet to the Frontsteps product.

15.     Although Mr. Waldinger required Plaintiff to terminate half of his team, Plaintiff still exceeded the company's upgrade goal by more than twice the target, ultimately converting 53% of the AtHomeNet customers to the new Frontsteps product.

16.     Due to his excellent performance, Plaintiff received only positive feedback from Mr. Waldinger and his achievement was commended in front of Frontsteps' Board of Directors and during all-hands meetings within the company.

17.     Plaintiff continued to meet or exceed his performance expectations throughout his employment with Frontsteps.

18.     Plaintiff is disabled under the ADA in that Plaintiff has a history of alcoholism.

19.     When Plaintiff is not sober, his alcoholism significantly impacts one or more major life activities, including but not limited to: caring for himself, performing manual tasks, walking, speaking, concentrating, thinking, communicating, interacting with others and the operation of major bodily functions, i.e., brain function.

20.     Plaintiff was sober from August 15, 2016 until he relapsed in April 2018.

21.     From April 2018 until early December 2018, Plaintiff only drank while he was out of the office on travel.

22.     During this time, Plaintiff neither drank at the office or at other company events nor in front of Frontsteps' clients.

23.     Plaintiff's relapse did not impact his job performance.

24.     On December 9, 2018, Plaintiff flew to Florida for work and planned to meet with customers the next day when several of his subordinates were scheduled to arrive.

25.     Plaintiff's relapse resulted in him drinking heavily into the next day, December 10.

26.     Plaintiff called Mr. Waldinger on Monday, December 10, 2018, several hours before Plaintiff was scheduled to meet with his team and Frontsteps' customers.

27.     During their phone conversation, Plaintiff disclosed his history of alcoholism and told Mr. Waldinger that he needed to seek intensive treatment/rehabilitation immediately.

28.     Mr. Waldinger directed Plaintiff to return to Denver and take a couple of days off.

29.     When Plaintiff returned to Denver, he continued to suffer from an alcoholic episode.

30.     Plaintiff sent an e-mail to his sales team on Wednesday, December 12, letting them know that he was not feeling well and would need to take several more days off and that he would keep them updated.

31.     On Thursday, December 13, Mr. Waldinger told Plaintiff that they needed to talk and the two of them scheduled a time to speak by phone the next day.

32.     When Plaintiff joined Mr. Waldinger on the call on Friday, December 14, Frontsteps' Human Resources Director, Juli Royster, was also on the line.

33.     Plaintiff told Mr. Waldinger and Ms. Royster that he was struggling with alcoholism, needed help, and was exploring his options for treatment.

34.     Mr. Waldinger responded with frustration, including making comments like "you've been MIA," "we need you here," and "you can't do this," referring to Plaintiff's request to take time off in order to seek treatment.

35.     Plaintiff mentioned that he had been looking at inpatient treatment programs, which are normally thirty days long, but that he had not committed to a specific program yet and was still considering his options.

36.     Later that night, Mr. Waldinger sent Plaintiff a text message in which he said that the company agreed to grant Plaintiff a 30-day unpaid leave of absence with the expectation that Plaintiff would return on January 16, 2019.

37.     On December 21, after completing the chemical dependency intake process, Plaintiff enrolled in the Chemical Dependency Intensive Outpatient Program ("CD-IOP") at Centennial Peaks Hospital in Louisville, Colorado.

38.     CD-IOP is not a traditional 30-day program; instead, it is an accredited Intensive Outpatient Program that requires completion of 20 three-hour sessions that take place three times a week in addition to attending at least two Alcoholics Anonymous ("AA") meetings weekly.

39.     Although classified as an out-patient program, CD-IOP requires an intense time commitment and, at the advice of counselors and therapists there, is most successful when patients complete the program exclusive of other commitments.

40.     Because of the CD-IOP's structure, Plaintiff would only have completed 11 sessions by his original anticipated return to work date of January 16, 2019.

41.     Despite this, Plaintiff was committed to returning to Frontsteps on January 16: he spoke with his treaters in the CD-IOP about returning to work full-time on that originally anticipated date and transferring to Centennial Peak's evening program to continue treatment after work hours.

42.     On January 11, 2019, Plaintiff sent Mr. Waldinger a text message telling him that his treatment would extend beyond January 16, but that he was meeting with his treaters in the CD-IOP to determine whether he could switch to an evening program beginning on January 16.

43.     Plaintiff expressed in the same text message that he "want[ed] to get back as well," and that, as of January 11, he intended to return on January 16, and he was "working with the team" at the CD-IOP to plan accordingly.

44.     During their text conversation, Mr. Waldinger expressed his eagerness to have Plaintiff return, including telling Plaintiff that Mr. Waldinger was "[e]xcited to get you back here my friend," and "Awesome! I can't wait to have you back!!!!!"

45.     Jeanne White, Plaintiff's chemical dependency counselor and the director of the CD-IOP, along with Plaintiff's other therapists and counselors, expressed their concerns that returning to work prior to the end of the program would cause increased stress that was not conducive to treatment and would increase the likelihood that Plaintiff would relapse.

46.     Ms. White and Plaintiff's other treaters from the CD-IOP recommended that Plaintiff return to work four weeks later on February 13, 2019 after completing his remaining nine sessions in the CD-IOP.

47.     Ms. White ultimately formalized Plaintiff's request for reasonable accommodation, i.e., unpaid leave until February 13, in a letter that she sent to Frontsteps on January 15, 2019.

48.     That same day, Plaintiff informed Mr. Waldinger and Ms. Royster via e-mail that the CD-IOP staff recommended that he complete the current program and that he would be available to return to work in four weeks.

49.    About ten minutes after receiving Ms. White's letter, Mr. Waldinger called her and inundated her with questions about the delay in Plaintiff's return to work.

50.    Among other things, Mr. Waldinger demanded to know why Plaintiff could not return earlier and pressed Ms. White for additional information about Plaintiff's condition.

51.    Ms. White told Mr. Waldinger that much of the information that he was requesting was protected patient health information that she could not disclose.

52.    Ms. White told Plaintiff about her conversation with Mr. Waldinger, including her observation that Mr. Waldinger had sounded agitated and frustrated.

53.    On January 16, 2019, Plaintiff received a voicemail from Frontsteps' Vice President of Operations and People, Deborah Cooper, stating that she and Mr. Waldinger needed to meet with Plaintiff in person.

54.    Plaintiff initially offered to meet them the following week, however, Ms. Cooper insisted that Plaintiff make himself available as soon as possible.

55.    Plaintiff agreed to meet with Ms. Cooper and Mr. Waldinger on Friday, January 18.

56.    During their meeting with Plaintiff on January 18, Ms. Cooper and Mr. Waldinger told Plaintiff that his leave would continue during the remainder of his treatment.

57.    Mr. Waldinger expressed continued frustration with Plaintiff's need for additional time off to seek treatment and stated that he would need Plaintiff's help "off-line" with a client, i.e., that he wanted Plaintiff to work while on medical leave.

58.    Plaintiff thanked Ms. Cooper and Mr. Waldinger for their understanding and explained the details of his treatment, including why he needed an additional four weeks of leave to complete it.

59.     Plaintiff also informed Ms. Cooper and Mr. Waldinger that he intended to return to work upon completion of his treatment as outlined in Ms. White's January 15 letter.

60.     During the January 18 meeting, there was some discussion about the potential of Plaintiff returning to work prior to February 13 on a part-time basis; however, Plaintiff said that he doubted that such an early return was possible but that he would check with the staff at the CD-IOP regardless.

61.     Plaintiff did not commit to provide any information to Frontsteps about the potential of working part-time and neither Ms. Cooper nor Mr. Waldinger set forth the expectation that he would do so.

62.     Neither Ms. Cooper nor Mr. Waldinger expressed concern with Plaintiff's projected return date of February 13, and both said that it was fine to come back to work at that time.

63.     While Plaintiff was away from the office, Defendant made several inappropriate disclosures regarding Plaintiff's alcoholism to his colleagues and subordinates, including the following examples:

a.   Mr. Waldinger making an unsolicited announcement to the team Plaintiff managed that he was on leave because he was in rehab;

b.   Ms. Cooper informed Plaintiff's subordinate, Rachel Shaw, that Plaintiff was in rehab for alcohol use;

c.   Ms. Cooper informing Ms. Shaw that, while Plaintiff was in Florida, he was sending e-mails that made it seem like he was drunk;

d.   Informing other employees that, while Plaintiff was in Florida, he had gotten drunk and was sending text messages regarding work matters;

e.  Mr. Waldinger telling Plaintiff's team that he had been terminated because of his alcoholism and use of medical leave; and

f.  Informing employees that Plaintiff had been terminated for drinking on the job.

64.   Following these disclosures, Defendant's comments on Plaintiff's condition and his treatment circulated through the office over the company's Slack messaging service, where employees asked each other if they had heard "about [Plaintiff.]"

65.   Prior to Defendant's numerous disclosures to its employees, no one was aware that Plaintiff was an alcoholic or that he was participating in a rehabilitation program during his absence from the office.

66.   On January 25, 2019, Plaintiff received a termination letter (dated January 24, 2019) in which Frontsteps made a number of accusations that were blatantly false, including that:

a.  Plaintiff had been "unresponsive" when the company "attempted to reach [him] to discuss the option of extending [him] leave";

b.  Plaintiff had not been truthful "about the nature and duration of [his treatment] program";

c.  Plaintiff had promised to advise the company on January 21 of his availability to return to work on a part-time basis; and

d.  Plaintiff had "prior performance issues" that Mr. Waldinger allegedly communicated to Plaintiff during their December 10, 2018 phone call.

67.   Plaintiff had never been informed of any performance issues prior to receiving this termination letter.

68.     Plaintiff's personnel file contained no disciplinary actions, write-ups, or notes that would indicate that Plaintiff's performance was in question at any time before the January 24 termination letter.

69.     Plaintiff filed charge of discrimination no. 541-2019-02060 with the Equal Employment Opportunity Commission (EEOC) on May 9, 2019.

70.     The EEOC issued a Notice of Right to Sue on January 24, 2020.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Disability Discrimination in violation of the Americans with Disabilities Act, as amended)

71.     The foregoing allegations are realleged and incorporated herein by reference.

72.     Plaintiff's alcoholism is a physical impairment that substantially limits several major life activities.

73.     Plaintiff was able and qualified to perform his essential job duties with or without a reasonable accommodation.

74.     It follows that, during his employment with Defendant, Plaintiff was a qualified individual with a disability under the ADA.

75.     Defendant discriminated against Plaintiff because of his disability by, among other things: responding negatively to Plaintiff's requests for reasonable accommodations; pressuring Plaintiff not to request leave to seek treatment for his disability; pressing Plaintiff's healthcare provider for information regarding Plaintiff's disability and treatment without Plaintiff's permission; pressuring Plaintiff to work while on medical leave; disclosing Plaintiff's medical condition and treatment to his subordinates and other employees who had no legitimate need to know; failing to engage in the interactive process in good faith; failing to provide reasonable

accommodations to Plaintiff that did not pose an undue hardship to the company; and terminating Plaintiff for patently false reasons.

76.　　Defendant's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of his federally protected rights.

77.　　As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Retaliation in violation of the ADA, as amended)

78.　　The foregoing allegations are realleged and incorporated herein by reference.

79.　　Plaintiff participated in statutorily protected activity by requesting a reasonable accommodation of his disability, i.e., time off work to obtain treatment, pursuant to the ADA.

80.　　Following Plaintiff's requests for reasonable accommodation, Defendant retaliated against him by, among other things: responding negatively to Plaintiff's requests for reasonable accommodations; pressing Plaintiff's healthcare provider for information regarding Plaintiff's disability and treatment without Plaintiff's permission; pressuring Plaintiff to work while on medical leave; disclosing Plaintiff's medical condition and treatment to his subordinates and other employees who had no legitimate need to know; failing to engage in the interactive process in good faith; failing to provide reasonable accommodations to Plaintiff that did not pose an undue hardship to the company; and terminating Plaintiff for patently false reasons.

81.　　Defendant's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of his federally protected rights.

82.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and

continues to suffer damages, including lost wages and benefits, diminished reputation and other

pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of

enjoyment of life, and other non-pecuniary losses.

**THIRD CLAIM FOR RELIEF**
(Invasion of Privacy – Intrusion Upon Seclusion)

83.     The foregoing allegations are realleged and incorporated herein by reference.

84.     Defendant intentionally intruded upon Plaintiff's seclusion or solitude by, among other

things: contacting Plaintiff's healthcare provider without Plaintiff's knowledge or consent and

questioning Plaintiff's healthcare provider at length regarding Plaintiff's medical diagnosis and

treatment plan without justification.

85.     Plaintiff had a reasonable expectation of privacy regarding the details of his disability and

his treatment plan to the extent disclosure was not required to accommodate Plaintiff's disability.

86.     Defendant's inquiries were neither reasonably necessary to accommodate Plaintiff's

disability nor done with the intention of accommodating Plaintiff's disability.

87.     Defendant's intrusion would be highly offensive to a reasonable person.

88.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and

continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities,

emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

89.     Defendant acted in a malicious, willful and wanton manner in causing Plaintiff's

damages.

## FOURTH CLAIM FOR RELIEF
(Invasion of Privacy – Public Disclosure of Private Facts)

90.     The foregoing allegations are realleged and incorporated herein by reference.

91.     Defendant disclosed facts about Plaintiff – including the existence of his disability and his participation in rehabilitation – to a large number of persons.

92.     Before Defendant's disclosure, the facts were private in that Plaintiff had not informed his colleagues or subordinates that he was absent to obtain treatment for his alcoholism.

93.     At the time of the disclosure, Defendant knew or should have known that the facts it disclosed were private.

94.     Defendant's disclosure would be highly offensive to a reasonable person.

95.     The facts disclosed were not of legitimate concern to the public, as they involved Plaintiff's condition and treatment which were not impacting his performance or the performance of his peers and subordinates.

96.     Defendant acted with reckless disregard of the private nature of the facts disclosed.

97.     As a proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress, inconvenience, mental anguish, and related injuries of a similar nature.

98.     Defendant acted in a malicious, willful and wanton manner in causing Plaintiff's damages.

## FIFTH CLAIM FOR RELIEF
(Outrageous Conduct/Intentional Infliction of Emotional Distress)

99.     The foregoing allegations are realleged and incorporated herein by reference.

100.     Defendant's course of conduct towards Plaintiff as described in this Complaint –

including disclosing that Plaintiff was an alcoholic, questioning Plaintiff's health care provider at

length about Plaintiff's disability and treatment, that Plaintiff was absent from the office because

he was in rehab, telling employees that Plaintiff had been intoxicated on a business trip to

Florida and was sending e-mails in which he seemed drunk, informing other employees of its

plans to terminate Plaintiff before telling Plaintiff, and telling employees Plaintiff was terminated

because he was an alcoholic – is so severe in degree that it goes beyond the bounds of decency

and is regarded as atrocious and utterly intolerable in a civilized community.

101.     Defendant's actions were extreme and outrageous and were done with the intent of

causing Plaintiff severe emotional distress.

102.     As a proximate result of Defendant's actions, Plaintiff has suffered and continues to

suffer loss of pay, salary and benefits, loss of job, loss of career opportunities, emotional distress,

inconvenience, mental anguish, and related injuries of a similar nature.

103.     Defendant acted in a malicious, willful and wanton manner in causing Plaintiff's

damages.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff David Scott Bradford respectfully requests that this Court enter

judgment in his favor and against Defendant Frontsteps and order the following relief as allowed

by law:

A.     Compensatory damages, including but not limited to those for emotional distress,

inconvenience, mental anguish, and loss of enjoyment of life;

B.     Back pay and benefits;

C.      Reinstatement or front pay and benefits;

D.      Injunctive and/or declaratory relief;

E.      Punitive and/or exemplary damages;

G.      Attorney fees and costs of the action, including expert witness fees, as appropriate;

H.      Pre-judgment and post-judgment interest at the highest lawful rate; and

I.      Such further relief as justice allows.

## **PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted April 22, 2020.


By:     SWEENEY & BECHTOLD, LLC

        s/Charlotte N. Sweeney
        Charlotte N. Sweeney
        650 S. Cherry St., Ste. 700
        Denver, CO 80246
        Telephone: (303) 865-3733
        Fax: (303) 865-3738
        E-mail: cnsweeney@sweeneybechtold.com

        s/Jennifer M. Kinkade
        Jennifer M. Kinkade
        650 S. Cherry St., Ste. 700
        Denver, CO 80246
        Telephone: (303) 865-3733
        Fax: (303) 865-3738
        E-mail: jmkinkade@sweeneybechtold.com

        ATTORNEYS FOR PLAINTIFF


Plaintiff's Address:
1589 Hickory Drive
Erie, CO 80516

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By:    SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Jennifer M. Kinkade
Jennifer M. Kinkade
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: jmkinkade@sweeneybechtold.com